v. Carrington Mortgage Services. Donna Greenspan-Solomon on behalf of the Appellants, Marchisio, Plaintiffs Below, and seated with me at Council Table are Co-Counsel Jay Kim and Paul Kim. Your Honors, this appeal arises from Carrington's breach of a settlement agreement that was intended to resolve credit reporting and collection errors as well as violations of the Fair Credit Reporting Act, the FCRA, and the Florida Consumer Collections Practices Act, FCCPA. The Court correctly found that Carrington had breached the settlement agreement in at least four ways. However, the Court granted summary judgment to Carrington based on its erroneous finding that the Marchisios had shown no damages. In fact, the Marchisios showed both monetary damages in their new car financing terms and emotional damages from their severe stress and its physical manifestations. I understand the emotional damages come into play with some of the Consumer Act violations, but as to the breach of contract, you are relying primarily on the financial damages in terms of the increased interest rate on the car financing, or are you also relying on the emotional damages? Both, Your Honor. All right. Well, the Court had said that in a commercial contract you couldn't claim emotional damages and that would be what this was, a breach of contract. What is your response to that? Well, Your Honor, in Sheely v. MRI, this Court held that when the nature of the contract is such that emotional damages, quote, foreseeable, emotional damages will lie. And Sheely concerned the violation of a statute which the Court analogized to a contract and then found the plaintiff was a third-party beneficiary of such contract. Here no analogizing is necessary because we actually have the actual breach of an actual contract. Sheely also noted that emotional distress that is predictable is thus foreseeable. Here it was predictable and thus foreseeable that emotional distress would be a consequence of breaching the very agreement intended to resolve the federal rights violations of remedial statutes that specifically allowed for emotional distress damages. In fact, this Court found that, or sorry, the trial court found that one of the contract's fundamental purposes was to correct this misreporting. Assuming that we don't accept your argument on emotional damages, could you talk to us about the financial damages that you suffered as a result of the breach of contract as opposed to the statutory violation? Yes, Your Honor. The Court had found that by the time of the financing, Carrington had already breached the non-disparagement provision by virtue of sending out one of the AUDs on February 11, 2013. So they had already sent this negative and inaccurate reporting. And the Court also noted that the adverse Carr financing terms occurred after that specific fine. Well, the Court noted the disparagement and separately noted the Carr financing terms. But when it came to actually ruling on the breach of contract, the Court just ignored the actual damages from the Carr financing terms. So that would be . . . Settlements in January, they send out this incorrect report now reporting a second loan is pending, which of course is not true. And then 19 days later, your clients attempt to finance a Carr, and then they get these extremely high interest rate and a big down payment, correct? Yes, Your Honor. And the important thing to note, too, is that the contract, or sorry, well, the agreement said that it would be as soon as reasonably possible and that, you know, within the very outside, within the 90 days, but it said as soon as reasonably possible, and it said time was of the essence. And then later you could see that when the employee was directed to do what he did eventually and resolve those issues, it happened the same day. So it could have happened the same day, and since time was of the essence, it should have rather than sending out more disparaging and untrue . . . Leaving aside the non-disparagement, you're also relying on the fact of specific settlement agreement that it would be corrected as soon as possible, no later than 90 days, and that sending something out 19 days later that's absolutely wrong, that's the opposite of a correction. Even without the disparagement clause, you still are arguing that it's a breach of the settlement agreement. Absolutely. Otherwise, the duty to correct. Absolutely. Which the . . . yeah, I mean, the settlement agreement had two parts of that. One was by that time, you know, they had to correct it as soon as reasonably possible, but there's also the non-disparagement part of the settlement agreement itself, so it's really two different breaches of the settlement agreement. As to the FCRA violation, the court entered summary judgment correctly in favor of the Marchisio's, finding that the investigation of the ACD dispute was unreasonable, its conduct was willful, and that there was a causal link to the erroneous verification. However, the court erred in denying the emotional distress and punitive damages, entering only the maximum statutory damages, because the court incorrectly found that the emotional distress damages were pre-existing to the November 7, 2013, violation, but with emotional distress damages, first of all, the record shows that they had actually . . . his distress had improved in 2013, because Mrs. Marchisio specifically said in her declaration that because of his heart attack and his other issues, dealing from all the stress, that they weren't going to . . . she wasn't going to talk about it. He actually got better. He had improved. And then they get this November . . . they find out that there's still incorrect verification in November, 2013, after he had started to feel better, and the record showed that it actually exacerbated, whereas if they had complied with the agreement, rather than exacerbating his symptoms . . . You say there's an issue of factors to emotional damages? Yes, Your Honor. You're not asking for summary judgment on emotional damages, you're just asking for a trial on emotional damages? Yes, Your Honor. Okay. Also, the court denied punitive damages after finding that Carrington's willfulness was not based on intentional or purposeful misdeed. This was error for three reasons. Willfulness is sufficient itself for punitive damages without a knowing violation. You're saying the court just made a legal error, thinking that willfulness was inadequate,  Exactly, Your Honor. Also, the court erred in making this factual finding on summary judgment. And then also, the issue of punitive damages was not even raised by the parties in their summary judgment motion, and yet the court went ahead and found that they were not entitled to punitive damages. In other words, the defendant never even asked for summary judgment on the punitive damages. Correct. Since Fonte did that. Correct, Your Honor. As to the FCCPA violations, the court erred in granting summary judgment to Carrington on its bona fide error defense. The court found that the LPI letters occurred in the context of corrective action. That's the wrong legal standard. The requirement is to avoid not correct after the fact. The statute says that when a defendant is not liable, when it shows, when the defendant shows by a preponderance of the evidence that the violation was not intentional and resulted from bona fide error despite the maintenance of reasonable procedures. Here they did not have these reasonable procedures in effect to stop these LPI, the lender place insurance letters. They had no procedures to tell their vendor, SWBC, who sent out these letters, that no, don't send this out because we've already settled with this person. The only procedures were to correct, again, correct the error after the fact, which is what the court found that they did, but it was applying the wrong legal standard. So in this one, we contend, Your Honors, that the bona fide error defense should have been denied as a matter of law. This court has stated that a debt collector asserting the bona fide error defense must show that the error was not intentional, was bona fide, and, quote, occurred despite the maintenance of procedures reasonably adapted to avoid the specific error at issue. In the Owen case, this court addressed that last point, the third point, and specifically said, you know, there were two steps to that. One is maintaining the procedures, and the second was that these procedures must be reasonably adapted to the specific error. Here they didn't have those procedures to prevent the error. It was again only after the fact, after they told SWBC to stop sending out the LPI letters. And then as to attorney's fees, we would rely on the argument in the briefs as to the court failing to provide any clear explanation of its reasons for this 85% reduction in fees. If Your Honors have no questions at this time, I'd like to reserve the rest of my time for Thank you, counsel. Thank you. Good morning, Your Honors. Ernest Wagner for Carrington Mortgage Services. If it pleases the court, I'd like to start with the issues raised in our cross appeal, specifically that the court erred in entering a summary judgment on the willful FCRA claim. Willfulness or carelessness. Are you talking about the statutory damage claim? No, Your Honor. Excuse me. I'm talking about the summary judgment that the court entered on the willful FCRA claim, and yes, awarding the $3,000 in statutory damages for the three violations of the ACA. I just want to make sure what you're talking about. Yes. In other words, I gather from focusing on willfulness, are you conceding that if there's been a willful violation, then it was available for the plaintiffs to seek punitive damages? It is a possibility for them to seek. I agree with the trial court that they were not warranted in this fact pattern. You didn't ask for summary judgment? We did not. The court addressed that to Esponte, correct? Okay. Why is it not willful? It seems overwhelming evidence of willfulness. I respectfully disagree, so let me explain why. We're dealing with, in terms of FCRA, one response to an ACDV, November 7, 2013. This is not a multiple situation. Willfulness requires more than carelessness or unreasonableness, involves a high risk of harm. It's known or so obvious that it should be. It's not when it's promptly rectified like it was here a few months later. Single error is often not . . . A few months later? You mean in April, 2013? Correct, Judge. November 7 to April 23, 2013 is a few months later, and they've got to finance a car in the middle of that? No, Your Honor. I'm talking about the ACDV. That came later. The financing of the car was in February of 2013, many months before the issue with the response to the dispute through the credit bureaus, and it relates only to the breach of contract. Okay. I'm just talking about . . . Got it. Thank you. And so there was no intention or desire to thwart the plaintiff's here. Their complaint, and what the judge, I think, became a little confused about, was that the settlement agreement was not uploaded into the system that the response agent looked at. However, CMS was not reckless here for a number of reasons. First of all, the settlement agreement alone wouldn't have changed anything, even if he had access to it, which is something they never point out. The settlement agreement said that Carrington had to report the loan in the same manner as the prior loan, which is basically zero, right? I mean, that's not in dispute between any of the parties. Carrington did that. The mistake that it made is it left a balloon at the bottom of the FIC reform, which is in a different place. Looking at the settlement agreement wouldn't have helped Mr. Nguyen in responding any differently. It simply said it had to be zero. If he looked at it and saw that it's zero, that was reported consistently. The mistake was in leaving a balloon. You don't need to look at a settlement agreement that doesn't talk about the balloon. You admit there was a mistake. You just say it wasn't willful. Absolutely, Your Honor. He did make a mistake. The balloon should not have been there because it's inconsistent with zero. Am I remembering, because this is complicated, it was not only that the balloon was left, but there was also something indicating that they were behind on a payment or something as well? No, Your Honor. The agreement was that they had to be reported the same as the first loan. I don't care about the agreement. Just correct me. Is this the February, March, and April is where they're still showing ... There's something where they're still showing ... Yes, Judge. That was prior to the settlement agreement being complied with initially. There were a number of updated reportings that happened in February, March, and April. You're right. Before it was eventually fixed. That was corrected in April when it was reported as zero, and it was reported consistent with the first loan. It showed, unfortunately, it was supposed to be on the, I think, 29th of ... It showed the 29th of 2009 instead of the 9th of 2009 was the default date, but that 20 days is immaterial. It showed zero owed. The problem was that they had a balloon at the bottom, which they argue it should not have been there because we owe ... Let me tell you. If I'm looking to finance something, you got a balloon payment, a sizable balloon payment. That's very material and egregious false reporting. Your Honor, however ... How much did it show the balloon payment was? It was a significant sum. I don't ... What was it? It was over $100,000, right? I believe so, Your Honor. Right. How are you going to finance a car when it's showing you got a balloon payment? Your Honor, with all due respect, the ... You're saying that occurred before. I got that. Okay. I appreciate that. That is a materially, to me, willful false reporting. I don't understand your argument why it's not. It's not because it was a mistake, Your Honor. The size of the error does not ... A mistake means it's false, right? A mistake means it's incorrect, Judge. I mean ... Okay. The whole question is, after all this has gone on between the parties, whether it was willful. Correct. Whether it was willful to leave the balloon payment on there. The law is very clear, the Valvo case, the Smith case out of the 6th District. One mistake, such as this. This isn't really just one mistake. I mean, granted, this might be a different case if the only thing that ever happened in this case was there was this balloon payment and nothing else. This occurs in the context of literally years of errors and litigation and settlement agreements. I mean, why isn't it appropriate to consider the context in which this occurs? I believe it's appropriate to consider in terms of the reasonableness of the investigation, but we're still talking about one investigation. There's no evidence here that it happened a second time, that a second ... Why does it need to happen a second time in light of the record that we have that exists prior to the time that it happened here? Because the law is such that one violation of FCRA is not enough to show willfulness. It has to be a pattern. But this is a ... In this time period, it's the only violation, but there were other violations prior to this, right? That were the subject of the first settlement agreement. That was settled. It was just ... I understand. But when we look at this subsequent time frame, you say, oh, that's just one. We look at the whole context of all the prior violations as well, right? No prior violation is established, is my point. The only violation we're here to talk about is the alleged one that occurred in December of 2017. And I'm not saying you don't look at what happened before, but let's look at that. What happened before is there was a settlement agreement. The head of the ... Let's look at what happened before there was the first settlement agreement. I don't think that you do, Your Honor, because ... Why not? Because it doesn't relate to whether or not Carrington's responses to ACDVs is reasonable. That's the judge of willfulness here. Is the investigation unreasonable? Let me ask you this. Let's say this happens 10 times, and every time the plaintiffs bring a separate suit, and you settle it. And the 10th time that this happens, you say, well, the ACDV only related to the 10th time that it happened, and we settled all the rest, and it only happened once. Why would we not look at the 10 times or the nine times it happened before that? In that scenario, you might, because you're talking about the same thing happened over and over again. That's not what happened here, though, with all due respect. In this particular situation, we're looking at whether or not the response to the dispute at issue was so reckless that you can defer that it was willful as opposed to simply careless. But why, in light of all the other things that happened, why does it matter that in my hypothetical, it's all violations that are exactly the same versus all violations that are very similar? Why does that make a difference? In your hypothetical, I'm assuming that there were prior ACDV disputes, that they were investigated by a furnisher, and that investigation was consistently unreasonable and found the wrong conclusion, versus in this particular situation, we're not dealing with any prior disputes. This is the first one. The fact that the parties have other disagreements is not material. Isn't this all about the same loan transactions, though? You said it's the first dispute. This is all about the same house loan, for sake of a better word, same mortgage. The same two loans, correct. There was a first and a second. Throughout all of this, we're talking about not a credit card debt over here or a debt over there. We're talking about the same debt. Correct, Your Honor. Okay. How can it be the first mistake about the same debt? It's not the first mistake. When deciding whether or not a furnisher's investigation procedure into a FICRA dispute is unreasonable, you don't look at whether or not that defendant or furnisher previously breached a contract or had a prior lawsuit with the borrower. What if the next thing they do is they put in a third phantom loan? I mean, it's a different violation. Now they file an ACDV, you all resolve it, whatever. I mean, going to Judge Hall's point, it's the exact same transaction that we're talking about. Why do they get a clean slate every time they make a new error that relates to this particular transaction? It's not necessarily a clean slate, Judge. I'm not saying you have to put the fact pattern in a vacuum, but I am saying what you need to evaluate as a court and what the district court got wrong is Carrington's investigative procedures in responding to disputes through FICRA, right? The fact that it may have breached a contract or not breached a contract isn't part of the investigative process, and the investigative process here was not so careless or reckless that it could be found to be reasonable. The only reason the court found that it was is supposedly the settlement agreement wasn't put in a vacuum. He's now just argued the cross-motion for summary judgment. I mean, he wanted summary judgment on this, and you're doing that. I think we got this one. I think you need to go back to the breach of contract, okay? Okay. All right. It seems to me that they have a viable claim under the breach of contract, and they have approved and put aside emotional damage, financial damages, and we should reverse the summary judgment grant in favor of your client. I think you better argue about what they argued rather than trying to get more. You're trying to get more than you got. I think you better be more worried about defending what you got. Understood, Your Honor. Okay. Let me tell you where I come at there. It's clear there were breaches. You don't claim there weren't breaches of the agreement. Your Honor, first of all, there were several breaches. I think we point out in the brief what we concede was wrong. It should have been done in 90 days. We did it in 92. It should have had a zero balance as of February 29th, 2009, instead of February 9th. That was a mistake. And the balloon payment shouldn't have been there. All right. In addition, you also sent out in that time period between January and February three more reporting showing wrong . . . you sent out saying delinquent 180 days, three times, and you've admitted that. You say, well, we had 90 days. Those to me actually seem new violations, new . . . maybe not new causes of action, but new material breaches during that period of time in addition to what the district court found. Again, with respect, Judge, I would disagree. That's when we don't concede. And the reason is that the law of contracts in Florida, which controls, is very clear. A specific contractual provision controls over more general provisions. They're relying on the fact that it says as soon as reasonably possible. It gave . . . No, I'm saying you agreed in this contract, and I'm not in the non-disparage month, that you will report as having a zero loan balance in the same fashion as reported, and it should be done as soon as reasonably possible. Okay. You not only didn't report it as having a zero loan balance, you reported it as not having a zero loan balance, and you reported it three times, February 11, March 11, and April 11, as being delinquent 180 plus days, right? Your Honor, the provision, again, required . . . First of all, did you report it during that period? Not only failure to correct and report it right, you reported it three more times wrong. Is that correct? There were three more reports. That were errors. Forget about whether the contract, it was a breach. Is that correct? You're reciting the fact that there were reports, Judge, but remember, this is a settlement that we agreed to reduce it to zero. I just want to answer my question. During that period of time, that 90-day period, you sent out, it says, and I think you all admitted it, and you never said you didn't do it, you sent out new letters, new credit reports to CBR saying this loan was 180 days delinquent. Is that correct? Correct, Judge. Okay. That's all I wanted to know. Thank you, Judge. You just said it wasn't a breach because we had 90 days to clean this up, so the fact that we kept reporting it wrong doesn't matter. That is correct, Judge. Because the specific 90-day provision controls, it required Karen to do that by February . . . It also said as soon as reasonably possible. It did. At least there's an issue of fact is what that means because the district court said that later on when you get prodded, you could do things in a day or two, so isn't there at the least a disputed issue of fact is whether or not you could have gotten that done? At the least. I think that the issue of law that was correct to find at the lower level was that a specific provision controls over the . . . Yeah, but there's a good faith requirement in every contract. Is there not? There is, Judge. Okay. And so, if you have in the contract, as soon as reasonably possible, but in no case more than 90 days, don't you have an obligation to at least make a good faith effort to comply with as soon as reasonably possible, regardless of whether it says, but in no case more than 90 days? There's always a good faith provision of every contract, Judge, but I would again reiterate that a specific provision controls. They could have negotiated different language that says you have to do it in five days or ten, but they went with 90. Why would it have hurt you just to fix it immediately? You go back to them and say, we've settled the agreement, let's don't have any more litigation guys. Don't send out any more notice. Why would that have been something that you all . . . In a perfect world, Judge, they'd have done it the next day if possible, but that's not what we're dealing with here. We're dealing with . . . They did do it the next day. Once somebody told them what to do, they did it two days later. Just nobody ever told them. There was a failure of communication about the settlement or something. I don't know what happened, but it's not the plaintiff's fault. Explain to me. I don't even understand how the mechanics of this work. With any consumer, every month you're sending out a report to somebody, or they're waiting for an inquiry from somebody trying to . . . Every month you're sending out a report. Those are two different things, if I can explain something. That's correct. A furnisher like my client will send what's known as a tape for all of their loans every month to the three credit bureaus, or sometimes four, and that is what we're talking about here during that time period. It's just they continued to report the loan during those months before it was ultimately zeroed out at the end of the 90 days, around the 92nd day, and then there's a separate thing when you're responding to a dispute that comes in, which is what happened in November. I see I'm over my time, so unless you have any further questions . . . All right. Let me ask you one thing on the attorneys' fees. Sure. If we affirm on the statutory damages recovery, and as I understood it, it was like $485,000, and you asked them, saying, look, it should be cut to $90,000, is that right? In our brief to the district court below, we did say they originally raised six claims, one-sixth is . . . Okay, and so that's how you proceeded on a one-sixth thing. That's where we came up with that. Let's assume then, tell me why this wouldn't be correct, that if we affirm on that claim as to the statutory damages, okay, so they got the attorneys' fees on that, there's no problem, so if they have other claims that get remanded or reversed for trial because they're issues of fact or whatever, then they would get more attorneys' fees, okay? Because that's how you proceeded, saying they get that one-sixth for that. That would be the floor in this case, if we affirm on that count. If you affirm on just that count, we would argue it's not the floor simply because it's still unconscionable and more than they could charge their clients for. But you told the district court to give them $90,000. We also argued that that much was unconscionable. We make several arguments that it should at least go down to $90,000 and we're hopefully a good deal less because you can't charge people $90,000 for getting them $3,000. Okay, thank you. Thank you. But didn't you all charge, weren't your clients charged a quarter of a million dollars for your work? To defend against all six claims, correct, Your Honor. Thank you, counsel. Thank you very much, Your Honor. Thank you, Your Honor. Your Honors, if Your Honors have any questions for me, I'd be glad to respond. Otherwise, I will cede my time. Thank you, counsel. Thank you. We'll be in recess.